Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 01 C 50158 | **DATE** | 1/27/2003 |
| **CASE TITLE** | | Murphy vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached memorandum opinion and order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Summary Judgment is granted to Defendant.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | **Document Number** |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

JAN 27 2002
date docketed

docketing deputy initials

1/21/2003
date mailed notice

sp
courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
03 JAN 27 PM 1:44
FILED-WD

Date/time received in central Clerk's Office

sp
mailing deputy initials

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

JAMES MURPHY,                          )
                                       )
    Plaintiff,                   )      Case No. 01 C 50158
                                       )
       v.                      )      Magistrate Judge
                                       )      P. Michael Mahoney
JO ANNE B. BARNHART,                   )
COMMISSIONER OF SOCIAL                 )
SECURITY,                              )
                                       )
    Defendant.                   )

### MEMORANDUM OPINION AND ORDER

James Murphy, ("Plaintiff"), seeks judicial review of the final decision of the Commissioner

of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The

Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits

("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This

matter is before the Magistrate Judge pursuant to consents filed by both parties on January 3, 2002.

*See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.


### I.    BACKGROUND

Plaintiff filed for DIB on April 30, 1999, initially alleging disability since February 23, 1993.

(Tr.12).   After an unfavorable Administrative Law Judge ("ALJ") decision on October 30, 1997,

Plaintiff, through his attorney, amended the onset date to November 1, 1997.  (*Id.*).  Plaintiff's

application for benefits was denied on September 3, 1999. (Tr. 25). On October 1, 1999, Plaintiff

filed a request for reconsideration. (Tr. 32).  Plaintiff's request for reconsideration was denied on

February 1, 2000. (Tr. 34).  Plaintiff then filed a request for a hearing before an ALJ on February 29,

2000. (Tr. 37). Plaintiff appeared, with counsel, before an ALJ on August 24, 2000. (Tr. 43). In a decision dated October 19, 2000, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 22). On November 2, 2000, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 6). On March 22, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 4).

## II.   FACTS

Plaintiff was born on August 18, 1937, (tr. 50), and was sixty-three years old at the time of his August 24, 2000 hearing. (Tr. 179). According to his own testimony, Plaintiff completed his education through the ninth grade. (Tr. 184). At the time of the hearing Plaintiff was married residing with his wife. (*Id.*).

Plaintiff began working for the telephone company on October 19, 1971 and retired on August 26, 1992. (Tr. 185). As an employee of the phone company, Plaintiff's job was as a lineman for twenty years. (*Id.*). Although a lineman for twenty years, Plaintiff was assigned the duties of a cable locator for about ten of the twenty years.[1] (*Id.*). The problem is the record does not clearly provide an explanation of what exactly, if any, were the differences between the duties of a lineman and that of a cable locator. As a cable locator, Plaintiff would take the cable locator box and look for cables underground and mark them. (Tr. 187). However, what Plaintiff did as a lineman is fuzzy. Plaintiff did testify at his hearing that as a lineman he never had to lift more than 10 pounds[2],

---

[1] There appears to have been much confusion between the ALJ and the Plaintiff as to what exactly was Plaintiff's job and what was his job title and description.

[2] Here again there appears to be some confusion. Initially, Plaintiff testified that he never had to lift more than 10 pounds, but later in his deposition Plaintiff testified that he had to open cement lids that weighed about 50 pounds. (Tr. 209). When asked to clarify why Plaintiff both testified and filled out his Social Security forms that he only lifted not more than 10 pounds,

(tr. 186), or bury any cable. (Tr. 187).

In June 1997, Plaintiff testified that he was having chest pains. (Tr. 183). He was taking Nitroglycerin two or three times a day, in addition to Albuterol, an inhaler. (Tr. 194). Plaintiff testified that the Nitroglycerin would relieve the chest pains within approximately five minutes. (Tr. 198). In addition to his breathing problems, Plaintiff testified that his right leg and ankle bothered him. (*Id.*). Plaintiff described the pain in his right leg and ankle as "sharp." (*Id.*). Plaintiff took Advil and Darvon for a while to combat the pain of Plaintiff's arthritis in his right leg. (*Id.*).

Plaintiff testified that in 1997, he could have only walked about twenty to twenty-five feet ,(tr. 199), lifted five pounds, (tr. 200), and sat or stood for five minutes. (*Id.*). In terms of sitting or standing, the reason for such a short duration, Plaintiff testified, was because of his inability to stand up once sitting due to the pain in his right leg. (*Id.*). Interestingly enough, when informed by the ALJ that Plaintiff had been sitting for over thirty minutes during his hearing, Plaintiff stated "It's getting to bother me right now." (*Id.*). In terms of lifting, Plaintiff testified he could only lift five pounds. (*Id.*).

On a typical day, Plaintiff sat around and watched television. (Tr. 205). Plaintiff testified that in 1997 he did not: cook any meals, clean around the house ("That's not my job. That's what I got married for, 40 years of that's enough."), clean dishes, or do laundry. (Tr. 201). Plaintiff was, however, able to bathe and dress himself. (*Id.*). Plaintiff's only apparent exercise consisted of walking a little bit. (Tr. 202). Plaintiff's son-in-law did all the work around Plaintiff's yard such as gardening, raking leaves, shoveling, or mowing the grass. (*Id.*). When questioned by his counsel,

---

Plaintiff seemed to avoid the question and provide no reasonable explanation for the discrepancy.

Plaintiff testified that he did not do house work not because it was not his job, but because he was physically unable to do most housework because it required too much standing. (Tr. 205).

In terms of Plaintiff's past work, Plaintiff testified that the telephone company he worked for was bought by GTE. (Tr. 188). His job was eliminated because GTE contracted out cable locators and lineman. (Tr. 208). As of the hearing date, Plaintiff testified that, to his knowledge, most telephone companies were still hiring contractors to locate cable and not hiring cable locators as employees. (*Id*.).

## III.   **MEDICAL HISTORY**

The earliest medical report available to the Magistrate Judge is from March 16, 1989. (Tr. 118). On that date, Plaintiff was seen by an unnamed doctor[3] associated with the DeKalb Clinic. (*Id*.). The report indicates that Plaintiff had pain in the left, lateral chest and other problems. (*Id*.). Plaintiff indicated that it hurt for him to breathe and when he tried to turn or lie on his side. (*Id*.). The report further indicated that three years prior, Plaintiff had a peptic ulcer and had been having some epigastric burning, heartburn, and upset stomach. (*Id*.). The doctor gave Plaintiff Zantac samples for 10 days and indicated that he/she requested Plaintiff's previous records. (*Id*.).

The next medical entry of any substance is dated November 11, 1996, more than seven years after the earliest entry. (Tr. 119). The entry references a 1992 hospitalization in Rochelle, Illinois for chest pain, but the medical record before the Magistrate Judge does not contain the hospital

---

[3] It should be noted that all Plaintiff's medical records from the DeKalb Clinic Chartered do not contain a doctors name or signature. Rather, each entry is accompanied by initials. However, the Magistrate Judge has no way to ascertain whose initials go with each entry and thus the Magistrate Judge will not be able to use a proper name to correspond with each entry.

record. (*Id.*) Rather, according to the 1996 entry on Plaintiff's DeKalb Clinic History Sheet, Plaintiff saw a Dr. Valitis in December 1992. (*Id.*). During this 1992 visit, Plaintiff performed a treadmill test, the results of which were Plaintiff performing "up to 9.5 METZ with 1mm ST depression, no chest discomfort." (*Id.*). The November 1996 report further indicates that when Plaintiff tried to exercise he had pain in his chest and had to stop. (*Id.*). Plaintiff also complained he was having periodic zig-zag lines in his visual field, sometimes lasting up to 20 minutes. (*Id.*).

On November 29, 1996, Plaintiff had a full physical done. (Tr. 120). The doctor, initials IHS, performing the physical opined that Plaintiff had progressive angina, migraine headaches, and probable degenerative arthritis of the right knee and ankle and tendinitis of his right elbow. (Tr. 121). The doctor prescribed Metoprolol, 50mgs daily, and recommended the Plaintiff take one aspirin daily. (*Id.*). Additionally, the doctor recommended that Plaintiff see a surgeon for the cyst on his back. (*Id.*).

Plaintiff saw Dr. Yardley of the Phoenix Medical Practice on May 21, 1997. (Tr. 106). Dr. Yardley reported that Plaintiff's subjective medical history included a history of stomach ulcers, a heart attack on December 16, 1992, and trouble working due to the discomfort. (*Id.*). Dr. Yardley's assessment on May 21, 1997 was that Plaintiff had peptic ulcer disease, coronary artery disease and emphysema. (*Id.*). Plaintiff saw Dr. Yardley again on June 5, 1997. (Tr. 109). Dr. Yardley reported that Plaintiff has had midsternal chest discomfort which Plaintiff described either as " a vise" with pressure from the outside or a sensation "like a balloon inside my chest expanding." (*Id.*). Dr. Yardley found Plaintiff had "angina pectoris despite the fact that he has had a functional capacity of 9 mets in the past and has 2 previous normal thallium scans." (*Id.*). Dr. Yardley indicated his reasons for this diagnosis stemmed from Plaintiff's symptoms, which Dr. Yardley reported are

classical in their clinical pattern, and they have responded to sublingual and topical nitrates as well as Cardizem. (*Id.*). Dr. Yardley ultimately recommended coronary arteriography to confirm the diagnosis and search for alternate therapies. (Tr. 110). Additionally, Dr. Yardley increased Plaintiff's dosage of Cardizem to 240mgs per day. (*Id.*). The Plaintiff was referred to Dr. Phoenix, his family physician. (*Id.*).

Also on June 5, 1997, Dr. A. Kaplan of the Rockford Clinic's radiology department, performed an x-ray exam on Plaintiff's chest. (Tr. 111). Dr. Kaplan reported the "pa and lateral" views of Plaintiff's chest demonstrate some nonspecific opacities in the right apex that are unchanged from 1995 and presumably a function of Plaintiff's old granulomatous disease. (*Id.*). Additionally, Dr. Kaplan indicated Plaintiff's lung fields are clear and his cardiac silhouette is normal. (*Id.*).

On November 11, 1997, Plaintiff again saw a doctor at the DeKalb Clinic, but at this time Plaintiff was given a new doctor. (Tr. 123). This new doctor reported Plaintiff was on Lipitor, Dilacor XR 240 and aspirin. (*Id.*). Additionally, the doctor indicated Plaintiff had a history of chronic obstructive lung disease, hypercholesterolemia, coronary artery disease with infarction. (*Id.*).

Plaintiff saw Dr. W.K. Lee of the DeKalb Clinic on November 11, 1998. (Tr. 128). Dr. Lee indicated that Plaintiff had been coughing yellow phlegm often and having a hard time breathing. (*Id.*). However, Plaintiff's physical revealed a clear throat with no nasal obstruction. (*Id.*). Additionally, Plaintiff's heart had a regular rhythm with no rubs, murmurs or gallops. (*Id.*). Plaintiff's ECG indicated no hyperacute changes but the ECG was consistent with chronic obstructive lung disease. (*Id.*). Plaintiff's chest x-ray showed no definite infiltrate or process, but did indicate increased interstitial changes. (*Id.*). Dr. Lee prescribed Plaintiff Nasonex, Tussi-

6

Organidin and Lipitor. (*Id.*).

On January 15, 1999, a doctor at the DeKalb Clinic took Plaintiff off his Lipitor medication and ordered a CPK to make sure Plaintiff's symptoms were not due to myositis. (Tr. 130). Also, on January 15, 1999, Dr. Mervin Trepton of the DeKalb Clinic Radiology Department took x-rays of Plaintiff's chest. Dr. Trepton reported Plaintiff's lungs are essentially clear and his heart does not appear to be enlarged. (Tr. 117). Based on his x-rays and the possibility of his symptoms being a result of myositis, Plaintiff was prescribed Zithromax. (Tr. 130).

Plaintiff's pain in his chest and arm continued to bother him. On February 18, 1999 Plaintiff again saw a doctor at the DeKalb Clinic who reported that Plaintiff complained of continuing pain in his right elbow with pain starting in his left elbow. (Tr. 131). However, a x-ray done by Dr. Peter Leung of the DeKalb Clinic Radiology Department revealed no fracture or dislocation in either elbow and no bony or articular abnormalities. (Tr. 117). Additionally, on February 18, 1999, Plaintiff showed no signs of coughing, wheezing, shortness of breath, or any other cardiovascular, gastrointestinal, or urinary tract symptoms. (Tr. 131). Ultimately, the doctor ordered a stress test to determine the next course of action. (Tr. 133).

On April 20, 1999, Don Rabor administered a graded exercise stress test on Plaintiff. (Tr. 142). Mr. Rabor reported that Plaintiff's total exercise time was eight minutes, his maximum heart rate attained was 108bpm, which was sixty-eight percent of the maximum predicated, his maximum heart blood pressure was 154/58, and his maximum workload attained was 10.0 METs. (*Id.*). Mr. Rabor's interpretation of Plaintiff's results were that Plaintiff's baseline ECG revealed sinus rhythm and his baseline echocardiogram revealed preserved global left ventricular systolic function with no resting wall motion abnormalities. (*Id.*). Plaintiff did indicate to Mr. Rabor that he did experience

chest discomfort and shortness of breath during the exercise. (*Id.*). However, despite experiencing symptoms of chest pains, Mr. Rabor reported that no "ischemic st segment changes" or inducible wall motion abnormalities were seen with exercise, but rather reported an appropriate augmentation of "global lv function" was noted with no stress induced left ventricular dilation. (Tr. 143).

On July 8, 1999, Dr. Lawrence Hankin, of the Rockford Clinic, wrote a letter to Terry Liepscher of the Department of Rehabilitation Services, describing Plaintiff's full medical history. (Tr. 153). Dr. Hankin indicated that Plaintiff had applied for Social Security Disability for basically three reasons: 1) cardiac; 2) pulmonary; and 3) arthritis and joint pain. (*Id.*). Turning first to cardiac, Dr. Hankin indicated Plaintiff had an inferiro wall non Q wave myocardial infraction in 1992. (*Id.*). Since that time, Plaintiff had taken Nitroglycerin once or twice a day. (*Id.*). Dr. Hankin also reported that Plaintiff had never had an angiogram, but that he did have a stress test which showed no evidence of myocardial dysfunction. (*Id.*). Plaintiff's medications included Nitroglycerin, Cardizem (240mgs a day) and Lipitor cholesterol lowering. (*Id.*).

Next, in terms of pulmonary, Dr. Hankin indicated Plaintiff claimed to have emphysema. (*Id.*). However, Plaintiff has never smoked and his liver function test was "interestingly" quite normal. (Tr. 154). Also, Dr. Hankin mentioned that Plaintiff had a pulmonary function test (done on July 8, 1999), which showed a moderate restrictive disease with a vital capacity of sixty percent. (*Id.*). Plaintiff's FEV1/FVC were quite normal at eighty percent with no increase in bronchodilators. (*Id.*). Finally, Dr. Hankin indicated that no x-rays taken of Plaintiff's chest have shown evidence of active pulmonary disease. (*Id.*).

Lastly, Dr. Hankin addressed Plaintiff's arthritis. (*Id.*). Dr. Hankin indicated that Plaintiff reported his knees, hips, and elbows caused quite a significant amount of pain and that Plaintiff has

8

had trouble standing because of these pains. (*Id.*). To his knowledge, Dr. Hankin mentioned Plaintiff has not seen a rheumatologist. (*Id.*).

Overall, Dr. Hankin reported physical examinations of Plaintiff revealed an "oriented, alert gentleman in no apparent distress." (*Id.*). Specifically, Dr. Hankin indicated: Plaintiff's color was quite good, eyes were reactive, thyroid was not enlarged, the PMI was in the 7th intercostal space in the mid clavicular line, the heart rate was regular with a grad II/VI systolic murmur heard best at the apex, no diastolic murmurs, no gallops, no heaves, lungs show good air entry throughout without wheezing or rhonchi, no hepatoljugular reflex, and significant tenderness in the shoulders, elbows, wrists, knees, and hip but with no synovial thickening. (Tr. 154-155).

Dr. Deborah Albright, for the Social Security Administration, evaluated and reported Plaintiff's capacity assessment on August 20, 1999. (Tr. 158). Dr. Albright indicated Plaintiff can occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or walk about six hours in an eight hour day, sit about six hours in an eight hour day, and push and/or pull an unlimited amount of weight. (Tr. 159). Additionally, Dr. Albright indicated Plaintiff can climb, balance, stoop, kneel, crouch, and/or crawl frequently but because of his pain and tenderness in his joints, Plaintiff would not be able to do these activities on a continual basis. (Tr. 160). Dr. Charles Kenney, also for the Social Security Administration, also evaluated and reported Plaintiff's capacity assessment on November 29, 1999. (Tr. 166). Dr. Kenney's assessment of Plaintiff's limitations were the same as Dr. Albright's. (*Id.*).

On March 3, 2000, Dr. Lee, of the DeKalb Clinic, performed a medical assessment of Plaintiff's ability to do work-related activities. (Tr. 175). Dr. Lee reported that Plaintiff's ability to lift/carry is affected in that he could only lift thirty or less pounds occasionally. (*Id.*). Additionally,

Dr. Lee reported Plaintiff's ability to stand/walk, (*id.*), and/or sit, (tr. 176), is not impaired. In terms of postural activities, Dr. Lee reported Plaintiff can never climb but can occasionally balance, stoop, crouch, kneel, and crawl. (*Id.*). Plaintiff's physical functions, such as reaching, handling, feeling, pushing/pulling, seeing, hearing, and speaking, are also not impaired. (*Id.*). In terms of environment restrictions, Dr. Lee reported Plaintiff is restricted from temperature extremes, chemicals, dust, fumes, and humidity, but is not affected by heights, moving machinery, noise, or vibration. (*Id.*).

## IV.    STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."

10

*Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.   **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological

11

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[4] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[5] A severe impairment is one which significantly limits the claimant's physical or

---

[4]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[5]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found

13

not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

Before proceeding through the five step analysis, the Magistrate Judge must first address an argument raised by Plaintiff. Plaintiff argues that the medical findings of the ALJ are flawed because she did not consider the complete medical history contained in Plaintiff's prior file. (Pl's. Brief in Supp. of Pl's. Mot. for Summ. J. at 2). To fully understand what Plaintiff is arguing, a review of Plaintiff's hearing transcript is necessary.

Prior to the ALJ asking Plaintiff any questions at Plaintiff's August 24, 2001 hearing, an exchange took place between the ALJ and Plaintiff's lawyer.

ATTY: I see, well, November 1, 1997 clearly is the date we seek and at that

14

of this point require of formal amendment, I would request that or on Mr. Murphy's behalf. That is by the way the date following the previous decision of Administrative Law Judge of October 30, 1997, denying an earlier claims for benefits would clearly mean that there's no issue with respect to any seeking of any reopening of any prior Administrative decision in this claim.

ALJ: Okay, you said that there was an ALJ decision on October 30, 1997 and unfortunately I don't have the prior file. The state agency has indicated that the prior decision was on November 5th of 1997 and I know we're just discussing a few days here but still this will go toward the end of the date last insured, but to the - -.

...

ATTY: I will certainly tend to that. Related to that general issue, Your Honor, I, frankly had anticipated not having had an opportunity prior to today to see the file, that the earlier claim file which contains multitude of medical documentation would have been associated with the current file and the - - it does not appear that is has been at this point. I would strongly suggest that, that would be appropriate and necessary for longitudinal of understanding of Mr. Murphy's medical condition and it certainly was sufficient at the earlier time to satisfy the earlier Judge that there were significant levels of, of impairments but at that point based on that decision, not enough to satisfy that Judge. At any rate, I do ask that the earlier file be associated with this file and I assume that's certainly administratively possible.

ALJ: If we can locate it and it should have been. Someone should have attempted too, but I don't see that anyone actually did in this case. If we can locate it, I will request it and do - - with your permission I will admit it into the record as well and attach it to this file.

ATTY: Yes, thank you.

(Tr. 181-183). Based on the above, the Plaintiff argues the "ALJ agreed to admit that file into the record and to attach it to the instant file," and by not doing so, caused prejudice to the Plaintiff. (Pl's. Brief in Supp. of Pl's. Mot. for Summ. J. at 3). Furthermore, Plaintiff argues not only did the ALJ not admit the file but she also did not refer to or consider any of the medical records contained

15

in the prior file. (*Id.*). Thus, the Plaintiff argues the ALJ failed to fulfill her duty to protect the rights of the Plaintiff by failing to make the prior file part of the record, even after finding that the prior file would be admitted into the record. (*Id.*).

After reading the full transcript. including the excerpts quoted above, the Magistrate Judge fails to see such a strict agreement as alleged by Plaintiff. The Plaintiff is correct that the ALJ agreed to admit the prior medical records, but where the Plaintiff is mistaken, is that the ALJ agreed to admit the record *if* she could locate it. (Tr. 183). Thus, because the previous file is not now part of the record, it is reasonable to conclude the ALJ was unable to locate the file. (Def.'s Mem. in Supp. of Comm'r Mot. for Summ. J. at 7). Further, because it is reasonable to conclude the ALJ was unable to locate the file, it would be unreasonable to argue that the ALJ did not refer to or consider any of the medical records contained in the prior file. Plaintiff should note that the ALJ did consider evidence that related to the period of time before the October 30, 1997 decision on the Plaintiff's prior claim, (tr. 13-15), but this evidence is contained in the medical record currently before the Magistrate Judge.

The Magistrate Judge will now proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on October 19, 2000. (Tr. 12).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found the Plaintiff had the following medically determinable impairments: history of angina, controlled with prescribed medication; mild to moderate emphysema; and mild arthritis. (Tr. 20).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.      Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 20). The ALJ found that Plaintiff's allegations of disabling symptoms and limitations are not considered fully credible. (*Id.*). Specifically, the ALJ noted, regarding Plaintiff's lung impairment, the record does not reflect any pulmonary function studies with results equivalent to that required under the Listing 3.02. (Tr. 12). Additionally, although the record reflects a diagnosis of angina, the ALJ noted Plaintiff's testing does not demonstrate a cardiac impairment that satisfies Listing 4.04. (*Id.*).

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D. Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is able to perform his past relevant work. Specifically, the ALJ found that Plaintiff's past relevant work as a cable locator does not require the performance of the work-related activities precluded by Plaintiff's limitations. (Tr. 20). Specifically, the ALJ found Plaintiff's symptoms and limitations preclude "[l]ifting more than 50 pounds occasionally or 25 pounds frequently; working in environments with poor ventilation or exposure to concentrated levels of fumes, odors, dust, or gases." (Tr. 13). In coming to this assessment, the ALJ noted the objective medical evidence fails to provide strong support for the claimant's allegations of disabling symptoms and limitations. For example, the ALJ noted the "scarcity of physical examination abnormalities in this case is the [Plaintiff's] lack of regular treatment." (Tr. 17). However, the physical examinations that Plaintiff did receive "failed to reveal abnormalities consistent with the [Plaintiff's] complaints." (*Id.*). Additionally, "diagnostic testing also has failed to substantiate significant abnormalities." (*Id.*). In addition to the medical evidence, the ALJ noted consideration of other relevant factors, such as those included in 20 CFR §404.1529 (*How we evaluate symptoms, including pain*) and §416.929 (*How we evaluate symptoms, including pain*) and Social Security Ruling 96-7p. (*Id.*).

Additionally, the ALJ indicated inconsistencies with Plaintiff's testimony. Specifically, the Plaintiff testified that he could sit for only about five minutes at a time, but Plaintiff was observed by the ALJ sitting for thirty minutes at his hearing without any noted discomfort. (Tr. 18). Also, Plaintiff initially testified that he did not lift significant amounts of weight as a lineman, which is consistent with information supplied in Plaintiff's application, but when asked by his own attorney,

18

Plaintiff testified he was required to lift lids weighing fifty to sixty pounds from six to seven times a day. (*Id.*).

Lastly, the ALJ indicated that Plaintiff did not generally receive the type of medical treatment one would expect for a totally disabled individual. (*Id.*). The treatment he received, according to the ALJ, was essentially routine and/or conservative in nature, with significant gaps in Plaintiff's treatment history. (*Id.*). Also, Plaintiff's treating and consulting physicians did not observe any difficulties in Plaintiff's abilities in getting about or functioning during examinations despite Plaintiff's continued assertion to the contrary. (*Id.*). Taking all the above into consideration, the ALJ determined Plaintiff's description of past relevant work was "light" exertion, and Plaintiff's RFC is entirely consistent with the performance of his job. (Tr. 19).

Plaintiff makes three arguments against the ALJ's ultimate determination. First, Plaintiff argues that the ALJ did not give appropriate weight to the opinion of plaintiff's treating physician, Dr. William K. Lee at the DeKalb Clinic. (Pl.'s Brief in Supp. of Pl.'s Mot. for Summ. J. at 3). Second, Plaintiff argues the ALJ finding of RFC is based upon a flawed credibility assessment. (*Id.* at 3-4). Lastly, Plaintiff argues the ALJ's finding that the Plaintiff's past relevant work is "light" is not supported by substantial evidence in that, based on the evidence, Plaintiff's past relevant work is heavy and not light. (*Id.* at 5).

First, the Magistrate Judge will address Plaintiff's argument that the ALJ did not give appropriate weight to the opinion of Dr. Lee. Plaintiff argues Dr. Lee's letter dated June 8, 2000 states that Plaintiff "has symptoms related to his chronic obstructive disease, osteoarthritis and coronary artery disease." (*Id.* at 3)(*citing* tr. 174). Plaintiff further argues that Dr. Lee's medical assessment found that Plaintiff's lifting/carrying impairments were affected by his impairments and

that Plaintiff could lift and/or carry under thirty pounds occasionally and balancing, stooping,

crouching, kneeling and crawling occasionally. (*Id.*)(*citing* tr. 175). Thus, Plaintiff argues, he

should be placed in the "light" level of physical assertion rather than the "medium" level found by

the ALJ. (*Id.*).

Defendant argues the ALJ reasonably did not rely on Dr. Lee's opinion because Dr. Lee

provided his opinion in June 2000, two and one-half years after the Plaintiff's date last insured.

(Def.'s Mem. in Supp. of Commissioner's Mot. for Summ. J. at 8). Because of this time gap, the

Defendant argues Dr. Lee's opinion about the Plaintiff's ability to do light work in June 2000 is not

relevant to the Plaintiff's condition on December 31, 1997, two and one-half years after his date last

insured. (*Id.*)(*citing Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997)).

Without even addressing whether the ALJ gave appropriate weight to the opinion of Dr. Lee,

the Magistrate Judge finds Plaintiff's argument, that based on Dr. Lee's medical opinion, Plaintiff

should be place in the "light" level of physical exertion rather than the "medium" level, incorrect.

Dr. Lee determined that Plaintiff could lift and/or carry under thirty pounds occasionally. At thirty

pounds or less, the ALJ would have no choice but place Plaintiff in the "medium" level because

Plaintiff's ability to carry more then twenty pounds precludes the "light" level of physical exertion.

*See* 20 CFR §404.1567(b) and (c) (Physical exertion requirements)[6]. Even assuming Plaintiff is

correct (that he can only perform "light" work), substantial evidence exists, as discussed below, to

nonetheless support the ALJ's finding that Plaintiff's past relevant work is of "light" physical

---

[6]20 CFR 404.1567(b) (Light work) states, *inter alia*, "[l]ight work involves lifting no
more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10
pounds." 20 CFR 404.1567(c) (Medium work) states, *inter alia*, [m]edium work involves lifting
no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25
pounds.

exertion.

Next, Plaintiff argues the ALJ finding of RFC is based upon a flawed credibility assessment. A substantial portion of Plaintiff's argument that the ALJ's finding of RFC is based upon flawed credibility assessment is concentrated on Plaintiff's statement that doing housework was "not his job." Specifically, Plaintiff argues that it is improper for the ALJ to conclude that Plaintiff had the physical capacity to perform housework based upon Plaintiff's opinion that he was not responsible for performing this work because of his personal view that a wife and not a husband should perform housework. (Pl.'s Brief in Support of Pl.'s Mot. for Summ. J. at 4). Additionally, Plaintiff argues that the ALJ further ignored other evidence of statements by Plaintiff that demonstrate Plaintiff's functional limitations were based on his medical limitations. As support for this, Plaintiff cites Dr. Yardley's June 17, 1997 medical report which indicates Plaintiff's desire to mow the lawn and perform other moderately strenuous activities as evidence that Plaintiff did want to physically perform housework but was unable, not just because it was not his job.

The Magistrate Judge understands and acknowledges Plaintiff's argument that the ALJ's finding of RFC is based upon a flawed credibility. However, the Magistrate Judge does not agree. The Plaintiff is correct that the ALJ did not ask whether Plaintiff can perform certain household chores, only does he, and that when asked by his own attorney Plaintiff stated he could not perform such tasks. However, while the ALJ did state "[h]e claimed he did not do activities of daily living not because of any disabling condition, but because that was 'not his job,'" the ALJ relied on more than just this to question Plaintiff's credibility. (Tr. 17). For example, the ALJ discussed that Plaintiff testified that he could sit for only five minutes but was seen sitting for thirty minutes at the hearing, that Plaintiff did not receive the type of medical treatment one would expect for a totally

21

disabled individual, that none of Plaintiff's own treating or consulting physicians observed any particular difficulties getting about or functioning during examinations, and that Plaintiff's own testimony is very contradictory. (Tr. 17-18). Thus, the Magistrate Judge will not disturb the deference given to the ALJ in determining credibility. *See Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)(stating "[w]e have repeatedly stated that an ALJ's credibility determination will not be disturbed unless it is patently wrong."); *Herron v. Shalala*, 19F.3d 329, 335 (7th Cir. 1994)(stating "[s]ince the ALJ is in the best position to observe witnesses, we usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong.")

Lastly, Plaintiff argues that the ALJ's finding that the Plaintiff's past relevant work is "light" is not supported by substantial evidence. (Pl.'s Brief in Supp. of Pl.'s Mot. for Summ. J. at 5). In support of his argument, Plaintiff first asserts that the ALJ, in determining Plaintiff's past relevant work was "light" level, disregarded the prior ALJ's decision (even though, Plaintiff again argues, she agreed to admit the prior file) that the same past relevant work of the Plaintiff was "heavy." (*Id.*). The Magistrate Judge has already dismissed this argument above. The ALJ never agreed to admit the file, she only agreed to admit the file if she found it. Further, and what puzzles the Magistrate Judge, is if this prior decision and medical file was the key to Plaintiff's victory, as Plaintiff seems to represent it, then why did Plaintiff not submit the decision and medication information to the ALJ or to the Appeals Counsel?

Also in support of his argument, Plaintiff asserts that the ALJ incorrectly found that the Plaintiff's credibility was undermined because of contradictory statements made in his testimony. (*Id.* at 6). To fully understand Plaintiff's argument and the ALJ's findings, the Magistrate Judge

turns to the record. Plaintiff stated in Section 3A of his application that his job was that of a telephone lineman. (Tr. 62). Under the section titled *Lifting and Carrying*, Plaintiff stated "Cable Locator--App. 2lbs--2 or 3 times a day." (*Id.*). Under Section F (Check heaviest weight lifted), Plaintiff checked less than 10 lbs and under Section G (Check weight frequently lifted), Plaintiff checked less than the 10 lbs. (*Id.*). In Plaintiff's work history report, Plaintiff indicated his job was as a telephone lineman but for the last fifteen years of his twenty year career Plaintiff was a cable locator. (Tr. 77). However, in the very next section, Plaintiff wrote "A 'cable locator' weighed under 10 lbs and it was used perhaps 10 to 12 times per a normal day." (*Id.*).[7] Under the remake section of Plaintiff's work history report, Plaintiff stated "I started out as a lineman thruout [sic] my entire time I was there. After about 4 or 5 years they (the company) appointed me to be a cable locator." (Tr. 83). At his hearing, Plaintiff's employment situation gets even more confusing:

A:    I was not a locator, there was never any time during that time I was there that there was such a thing as a locator. I was a lineman.

Q:    You were a lineman.

A:    I started as a lineman and I retired as a lineman, that's all I was for the 21 years – 20 years I was there.

Q:    Okay.

A:    I was - - they appointed me as a cable locator. I've done that about, oh, I'd say 10 about 10 years of that 20 was - -that's what I did. I was still a lineman, my classification was a lineman.

Q:    Okay. Your classification was a lineman and as you testified today for 10 years at least and in your record you wrote 15 years that you were actually a cable locator and that you would never lift anything

---

[7] At this point in his argument, Plaintiff asserts "[a]t the time Plaintiff completed this application he was not represented by counsel." (Pl.'s Brief in Supp. of Pl.'s Mot. for Summ. J. at 6).

greater then 10 pounds during that time period. Is that right?

A:     A cable locator never, never weighed actually 10 pounds it only weighed four or five.

...

Q:     Not now, I'm not talking about - - I'm talking about in '97. But I wanted to get it clear for the record for 10 years there or 15 years as you've put it in your records, did you lift anything above 10 pounds

A:     No, ma'am.

(Tr. 185-187). After questioning by the ALJ, Plaintiff's counsel asked Plaintiff more questions about

how much a telephone lineman/cable locator picks up or lifts on a daily basis.

Q:     And, for what purpose were those activities necessary?

A:     I can't - - all I can do is tell you on the - - I'll answer your question, on the paper route going out of Rochelle when you locate the fiber cable or any - - they burry [sic] in big boxes cement boxes on the side of the road. There is one every what three miles. When you locate that cable we have a, had a tool that we would open these lids up, cement, cement about that thick that you pick these up and you went to get the, the, yours strands out to get the locator up. Each one of those would weight [sic] around 50 pounds a piece.

Q:     Each one of which?

A:     Of these lids.

Q:     The lids on the concrete containers?

A:     Yes.
...

Q:     Okay. In the course of your work, typically how may times in a day would you have to lift one of these 50 to 60 pounds lids?

A:     Well to give you an example, I located the fiber cable from Rochelle to Dixon, it took me exactly a week to do it. I would lift probably in a day's time about seven of them, six or seven of the them.

...

Q: In the course of six months, how much of the time of the locator would be on jobs where lifting lids of that sort was part of a job?

A: That, that is always part of your job if it has to be located. I'm not saying that you do it everyday. You may go, you may go a week and not have to locate the fiber then you may go a week and you'll have to to locate it two or three times a day.

(Tr. 210-211). However, then Plaintiff testified that during the summer, "you may go two weeks without having to lift those, those lids," (tr. 211), that he did not do that everyday, and that during the winter two months would pass and Plaintiff "never touched the fiber thing." (Tr. 216-217). Additionally, Plaintiff testified that several times he did not even lift the concrete lids but rather used a tile spade to scoot the lids off. (Tr. 217). Finally, before apparently giving up, the ALJ asked Plaintiff to clarify the discrepancy between his application/testimony with ALJ and with his testimony from his counsel:

Q: In any of your past work, but particularly I would assume that met as a cable locator which is what you describe and you said you never had to lift more then ten pounds.

A: As a cable locator, I never lifted more than that because, because - -

Q: You just testified today you had to lift these lids and these other things. Did you do that as a locator?

A: Not, not as a locator. See - -

Q: When you were, when you were - - in your job before you became a locator?

A: I was a lineman. Yes.

Q: Okay, but in the locator job did you ever have to lift those things, the lids or anything else?

25

A:    Yes. When your locating fiber you would always have to.

Q:    All right, then again that's more than ten pounds. Why did you list on these forms that you never lifted more than ten pounds as a locator?

A:    It's hard, it's hard to explain to a person as to what a locator is. Nobody seems to know what it is.

Q:    I know perfectly well what it is.

A:    It's not a job that you get. It is, it is appointed job. The company appoints you to do that job.

Q:    Okay, you're not responding to my question though, why did you put in this form you never lifted more than ten pounds but your testifying today that you did have to lift more than ten pounds?

A:    Well as, as a lineman you would lift a lot more than that. When I, when I - -

Q:    I don't want to know about your job as a lineman. I want to know about your job as a locator. And in these forms you said you never lifted more that 10 pounds.

A:    I don't know. I don't understand that.

(Tr. 215-16). Based on Plaintiff's application which he filled out himself and his original testimony to the ALJ, it appears the ALJ determined Plaintiff's past relevant work experience as "light" physical exertion. That determination is supported by substantial evidence.

In addition to the above, the Magistrate Judge notes that both Dr. Albright and Dr. Lee, who performed a medical assessment of Plaintiff's ability to do work-related activities, found that, at the very least, Plaintiff is able to lift/carry thirty pounds occasionally and that Plaintiff's ability to stand/walk and/or sit is not impaired. (Tr. 175). Thus, based on the medical assessment performed on Plaintiff, Plaintiff is capable of performing "medium" level physical exertion. Considering that

26

the heaviest object Plaintiff dealt with was a concrete lid, which he did not even lift but rather used a tile spade to scoot the lid, and, as Plaintiff testified, he only occasionally came into contact with the concrete lid, it appears, based on the above, that the ALJ's determination that Plaintiff could return to past work is reasonable.

Substantial evidence exists to support the ALJ's finding that Plaintiff could have performed past relevant work and the Magistrate Judge finds no reason to disturb it. Therefore, the ALJ's determination as to Step Four of the Analysis is affirmed. Because the Plaintiff's RFC allowed him to return to past relevant work, he is found not disabled and there is no need to move on to Step Five.

## VII.   CONCLUSION

For the reasons stated on the attached memorandum opinion and order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Summary Judgment is granted to Defendant.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 1/27/03